**Dale E. HARPER, Appellant (Defendant),**

v.

**The STATE of Wyoming,
Appellee (Plaintiff).**

No. 97–47.

Supreme Court of Wyoming.

Dec. 23, 1998.

Sylvia L. Hackl, State Public Defender; and Donna D. Domonkos, Appellate Counsel, for Appellant.

William U. Hill, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Georgia L. Tibbetts, Senior Assistant Attorney General, for Appellee.

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN and TAYLOR,* JJ.

THOMAS, Justice.

The sole assertion of error in this case is that Dale E. Harper (Harper) was denied his constitutional right to a fair trial due to prosecutorial misconduct in making closing argument to the jury. In his brief, Harper argues multiple aspects of this contention: (1) vouching for the credibility of the witnesses; (2) injecting the prosecutor's opinion on the weight of the evidence; (3) shifting the burden of proof to Harper; (4) improper comment on Harper's exercise of his right to silence; (5) attacking the integrity of defense counsel; (6) improper comments concerning Harper that asserted facts not in evidence; and (7) cumulative error. No objection, with one insignificant exception, was lodged to the prosecutor's closing argument, and we must review Harper's case under the standard of plain error. The application of that standard, in light of our cases addressing claims of prosecutorial misconduct in closing argument, discloses no plain error. The Order Upon Jury Verdict, imposing a life sentence on Harper, is affirmed.

* Chief Justice at the time of expedited conference; retired November 2, 1998.

The issue articulated in the Brief of the Appellant, filed on behalf of Harper, is:

The appellant was denied a fair trial as guaranteed by the due process clauses of the United States and Wyoming Constitutions because of prosecutorial misconduct during the closing argument.

In the Brief of Appellee, the State of Wyoming states the issue in this way:

Was appellant denied a fair trial because of statements made by the prosecutor during closing arguments?

While Harper's contentions do not reach the evidence in this case, it is important to an understanding of the several assertions of prosecutorial misconduct in closing argument to have the facts in mind. On May 22, 1996, a construction crew was installing a fence east of Highway 30, approximately eight to ten miles north of Laramie, Wyoming. Between 6:00 and 6:30 p.m., the crew stopped their work on the fencing job and drove into Laramie for dinner. When they returned to the work site around 8:00 p.m., one of the members of the crew discovered a dead body in a ditch near their work site. The crew immediately called 911 to advise the Laramie Police Department of the discovery of the body. A Laramie pathologist later determined that the victim had died as a result of a close range shotgun blast to the back of the head.

Harper and the victim were partners in the distribution and sale of cocaine in Laramie and Colorado. James Mayo (Mayo), one of their customers, resided in Laramie. During May of 1996, Harper and the victim made two trips from Colorado to Laramie to sell cocaine to Mayo. On May 14, 1996, Harper and the victim visited Mayo at his residence. On that occasion, Harper "fronted" Mayo two ounces of cocaine at a cost of $1,000.00 per ounce.[1] Mayo subsequently paid for the cocaine by wiring money to Harper in Colorado. On May 17, 1996, Harper and the victim returned to Laramie and engaged in another drug transaction with Mayo. On that occasion, Harper "fronted" Mayo three ounces of cocaine at a cost of $1,000.00 per ounce. On May 21, 1996, Mayo sent a $2,000.00 money order to Harper in Colorado via Western Union, as partial payment for that cocaine.

Between noon and 12:30 p.m. on May 22, 1996, the victim drove his silver 1985 Toyota Tercel to Harper's residence at the Silver Spruce Motel in Glenwood Springs, Colorado. Within a short time, Harper left his residence driving the victim's car, while the victim stayed at the motel to visit with Harper's two daughters, AH and FH. Harper went to the Safeway Store in Glenwood Springs where he picked up the $2,000.00 wired to him by Mayo the previous day. After he obtained that money, Harper went to Center Drug, where he purchased a .410 gauge shotgun and a box of three inch shotgun shells. He then crossed the street and purchased a hacksaw at the True Value Hardware Store. Around 3:00 p.m., Harper returned to the motel, and he then left with the victim in the victim's automobile for a trip to Laramie. At approximately 8:00 p.m., Harper arrived at Mayo's home driving the victim's silver 1985 Toyota Tercel. Harper delivered another ounce of cocaine to Mayo, and reminded Mayo that he still owed Harper money from the previous drug transaction. After he left Mayo's residence, Harper called a friend in Laramie, at approximately 8:30 p.m., to invite the friend to meet him for a drink at a local bar. The friend declined Harper's offer to meet for a drink, and Harper returned that evening to Glenwood Springs. Harper arrived alone, on foot, at the Silver Spruce Motel in the early morning hours of May 23, 1996. Harper had the victim's black bag containing cocaine and a sawed-off shotgun. Police later recovered the victim's silver 1985 Toyota Tercel from the parking lot at the Ramada Inn Hotel, located about one block from Harper's motel.

Harper was charged with one count of murder in the first degree. At the conclusion of a jury trial, Harper was found guilty of that charge. On December 17, 1996, an Order Upon Jury Verdict was entered, and Harper was sentenced to a life term of imprisonment in the Wyoming State Penitentia-

---

1. We understand the term "fronted" to connote that Mayo did not have to pay for the cocaine at the time, but would be expected to pay for it later out of the proceeds of a resale.

ry. Harper takes this appeal from his conviction and sentence.

■ Harper contends that he was denied the constitutional right to a fair trial because of prosecutorial misconduct committed in the closing argument for the State. Harper essentially made no objection to that closing argument at trial. "The general rule in Wyoming is that a failure to interject a timely objection to an allegedly improper argument is treated as a waiver, unless the misconduct is so flagrant as to constitute plain error and require reversal." *Armstrong v. State*, 826 P.2d 1106, 1115 (Wyo. 1992), *followed by, Chavez–Becerra v. State*, 924 P.2d 63, 69 (Wyo.1996). The plain error analysis that must be pursued in the absence of objection requires the party claiming error to demonstrate the violation of a clear and unequivocal rule of law, clearly reflected in the record, and resulting in the abridgment of a substantial right of the party to his material prejudice. *Arevalo v. State*, 939 P.2d 228, 232 (Wyo.1997); *James v. State*, 888 P.2d 200, 207 (Wyo.1994).

■ In *Dice v. State*, 825 P.2d 379, 385 (Wyo.1992), we articulated our policy with respect to claims of plain error occurring in closing arguments, saying:

> Plain error in closing argument must remain hard to find because otherwise the trial court becomes charged with an adversary responsibility to control argument even when objection is not taken by the opposing attorney.

We have been consistent in our application of this concept. *Smith v. State*, 880 P.2d 573, 574 (Wyo.1994); *Taul v. State*, 862 P.2d 649, 659 (Wyo.1993); *Miller v. State*, 830 P.2d 419, 427 (Wyo.1992). When no objection has been made to an improper closing argument, the appellate threshold for reversal is "a substantial risk of a miscarriage of justice." *Dice*, 825 P.2d at 384; *followed by, Sturgis v. State*, 932 P.2d 199, 201–02 (Wyo.1997).

■ Our examination of specific claims that the prosecutor has gone beyond the bounds of permissible argument is made by evaluating the comment claimed to be improper in the context of the entire closing argument. *Sturgis*, 932 P.2d at 201; *Hop-*

*kinson v. State*, 632 P.2d 79, 166 (Wyo.1981); *cert. denied* 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982), *cert. denied* 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983). The purpose of closing argument to the jury is to afford counsel the opportunity to offer ways of viewing the significance of the evidence heard by the jury. *Virgilio v. State*, 834 P.2d 1125, 1127 (Wyo.1992); *Pearson v. State*, 811 P.2d 704, 708 (Wyo.1991). The scope of permissible argument and the potential injury from any misconduct are best determined by the trial judge. *Christian v. State*, 883 P.2d 376, 381 (Wyo.1994); *Dice*, 825 P.2d at 384 (*quoting Jeschke v. State*, 642 P.2d 1298, 1301–02 (Wyo.1982)).

■ We turn then to consider the specific claims asserted by Harper. In the first of those, Harper contends that there was an improper vouching for the credibility of the State's witnesses. It is improper for the prosecuting attorney, even in responding to defense arguments, to personally vouch for the credibility of the State's witnesses. *Arevalo*, 939 P.2d at 231; *Fales v. State*, 908 P.2d 404, 410–11 (Wyo.1995). *See also, ABA Standards for Criminal Justice Prosecution Function and Defense Function*, Standard 3–5.8 (3rd ed.1993). In *Barela v. State*, 787 P.2d 82, 83–84 (Wyo.1990), we stated the rationale for this rule:

> When the prosecutor asserts his credibility or personal belief, an additional factor is injected in the case. This additional factor is that counsel may be perceived by the jury as an authority whose opinion carries greater weight than their own opinion: that members of the jury might be persuaded not by the evidence, but rather by a perception that counsel's opinions are correct because of his position as prosecutor, an important state official entrusted with enforcing the criminal laws of a sovereign state. While the prosecutor is expected to be an advocate, he may not exploit his position to induce a jury to disregard the evidence or misapply the law.

*Barela* was followed in *McCone v. State*, 866 P.2d 740, 754 (Wyo.1993).

■ In arguing Harper's case to the jury, the prosecutor uttered several comments

that alluded to the discrepancy in the stories that Harper's two daughters and one of their friends gave to an investigator for the defense, as compared to their testimony at trial relating to Harper's whereabouts on May 22, 1996. Initially, Harper's daughters and their friend advised an investigator for the defense that Harper had been at home the entire day, thus providing Harper with an alibi defense. At trial, however, both of Harper's daughters and the friend testified: (1) the victim had arrived at Harper's motel between noon and 12:30 p.m. on May 22; (2) Harper had taken the victim's car and left from about noon to 12:30 p.m. until around 3:00 p.m.; (3) shortly after 3:00 p.m., Harper and the victim left in the victim's car for Laramie; and (4) Harper returned alone on foot to the motel in the early morning hours of May 23, 1996, carrying the victim's black dufflebag which contained cocaine and a sawed-off shotgun.

In making reference to these conflicting stories, the prosecutor stated during closing argument:

[J.K.] testified in court that she helped in establishing a false alibi for the Defendant Harper to lead police in other directions. Why did they do this? They did this because they had a relationship with Harper. They were trying to help Harper, but when the presence of Harper leaves and he's in jail for six months, you can see the pressure is off and *they can come into court and testify truthfully* as to what happened at that time and day.

\* \* \*

\* \* \* [A.H.] established a false alibi with [J.K.] and another woman so that she could protect her father. Once her father is away from her, once that she has the chance to get adjusted and live a somewhat normal life, she came into court and testified very strikingly, very courageous, *and as the truth* \* \* \*.

\* \* \*

After [F.H.] concluded her testimony, I asked do you love your father. She loved her father and she began to weep. *But what she told you was the truth.* \* \* \*

\* \* \*

\* \* \* Again how should we judge that testimony? What reason would these girls have to possibly lie? They have feelings for their father, but those feelings are not again shrouded by the evil presence of the Defendant and *they are able to testify truthfully in this court.*

\* \* \*

\* \* \* Now we've told you time and time again that these people have gotten together. They established an alibi. Then when they did not have the pressure of the Defendant bearing upon their back, *then they told you the truth.*

\* \* \*

\* \* \* And that was at the time that the police officer stopped him [Harper], or in the second situation in which [the investigator for the defense] and [the defense counsel] got together and talking about the original statements of the girls, which they came to court and said that wasn't true. We love our father and we wanted to help him at that time. But now we're going to come into court and give you the truth. *And that is what has been done and that is what we have offered for you.*

\* \* \*

\* \* \* It is based, the testimony in evidence that you have heard today, it is based on, *it is credible. And it is credible for conviction.*

(Emphasis added.)

We do not interpret the remarks of the prosecutor in the same way that Harper chooses. The prosecutor was not personally vouching for the credibility of Harper's daughters and their friend. He argued only that the daughters and their friend testified truthfully on the witness stand as compared to not speaking truthfully when they were interrogated by Harper's investigator. At no point did the prosecutor *personally* vouch for the credibility of these witnesses. His argument simply was that they had testified truthfully in court. We perceive no impropriety on the part of the prosecutor in making these arguments, and certainly they did not reach the required level to constitute plain error.

Harper's next allegation of impropriety is that the prosecutor improperly injected his opinion with respect to the weight of the evidence. During closing argument, the prosecutor told the jury:

I realize your doubt is great, but *I think* the evidence is overwhelming and the avalanche of evidence will support your decision for conviction of first degree murder in this case. * * *

(Emphasis added.)

And at 14 years of age, her life is without a doubt clouded by the evil presence of her father in this case. But *I think* what was startling about this testimony is the fact that in spite of all that he has done to her—

[Defense Counsel]: Your Honor, I would object to that comment. He says, what I think is startling about this testimony, is he points out a personal opinion, which is prohibited. I would object to that.

THE COURT: Rephrase that. I submit to the jury. You may go forward.

(Emphasis added.)

■■■■ We have held that it is improper for a prosecuting attorney to inject his opinion as to the weight of the evidence in arguing to the jury. *McLaughlin v. State,* 780 P.2d 964, 967 (Wyo.1989); *Barnes v. State,* 642 P.2d 1263, 1265 (Wyo.1982). *See also, ABA Standards for Criminal Justice Prosecution Function Defense Function, supra,* Standard 3–5.8. The occasional inclusion of phrases like "I believe" or "I think" in an argument, however, is not prejudicial. *Browder v. State,* 639 P.2d 889, 895 (Wyo. 1982). We hold, in this instance, that even though the prosecutor's comments arguably may have been improper, the argument in this case was not so blatant, repetitious, or damaging as to prejudice Harper's right to a fair trial. We discern no plain error.

In his third claim of improper argument, Harper asserts that the prosecutor impermissibly shifted the burden of proof from the State to the defendant, and further the prosecutor improperly commented upon Harper's right to remain silent. In part, during his closing argument, the prosecutor said:

We have self-serving statements about where he was and what he did. But he never gave them in a time and place that could be verified by law enforcement or anybody else. What we have and what [defense counsel] is trying to present is a floating defense. When [defense counsel] got up and in his opening statement he attacked law enforcement and the credibility of the County Attorney's Office, but he never told you what was going to be presented in this case. Why not? Because he wanted to wait to a time and place so he could have his client get up and modify his testimony to the evidence that is admitted.

His statement was never given to anybody about a different alibi until we showed the following [evidence].

■■■■ A basic premise in our criminal law is that the burden of proof rests upon the State and never shifts. *Phillips v. State,* 835 P.2d 1062, 1073 (Wyo.1992); *Stephens v. State,* 774 P.2d 60, 75 (Wyo.1989). We also have held that it is improper and reversible error for the prosecutor to comment on the exercise by a defendant of his right to remain silent. *Vigil v. State,* 926 P.2d 351, 359 (Wyo.1996); *Fortner v. State,* 843 P.2d 1139, 1146 (Wyo.1992).

■■■■ Our reading of the prosecutor's argument, about which Harper complains, does not lead us to a conclusion that the prosecutor was suggesting that the burden of proof shifted to Harper. Even assuming that these comments might imply a shift in the burden of proof, the trial court correctly instructed the jury that the burden of proof rested with the State to prove every material and necessary element of the crime beyond a reasonable doubt. With respect to the claim that the challenged comments constituted a violation of Harper's exercise of his right to remain silent, the comments do not in our judgment present a "substantial risk of a miscarriage of justice."

■■■■ In yet another contention of impropriety in the closing argument, Harper urges the proposition that the prosecutor improperly attacked the integrity of his defense counsel. Harper points to this state-

ment by the prosecutor during closing argument:

> When [defense counsel] got up and in his opening statement he attacked law enforcement and the credibility of the County Attorney's Office, but he never told you what was going to be presented in this case. Why not? Because he wanted to wait to a time and place so he could have his client get up and modify his testimony to the evidence that is admitted.

Harper suggests that by this comment, the prosecutor inferred that defense counsel suborned perjury by having Harper modify his testimony. Certainly the prosecutor, like his adversary, must refrain from making unfounded and inflammatory attacks on the opposing advocate. *United States v. Young,* 470 U.S. 1, 9, 105 S.Ct. 1038, 1042, 84 L.Ed.2d 1 (1985); *United States v. Murrah,* 888 F.2d 24, 27 (5th Cir.1989). In the context of this closing argument, however, we hold that, although the prosecutor's comment might be perceived as improper, it did not amount to conduct so egregious as to constitute plain error and justify a new trial.

■ In his last specific claim of impropriety, Harper contends that the prosecuting attorney made improper comments concerning Harper's character which asserted facts that were not in evidence. Harper points with particularity to these statements by the prosecutor:

> Now, [defense counsel], in his opening remarks, indicated that there would be tremendous pressure on these witnesses by the State that causes them to testify in a certain way. *I would ask the jury if you'd keep in mind the tremendous evil presence of Dale Harper. He is a man that can suck out the good. He can suck out what is true from anybody he comes in contact with. He can take what is good and turn it into something evil in a matter of moments.*
>
> * * *
>
> [J.K.] testified in court that she helped in establishing a false alibi for the Defendant Harper to lead police in other directions. Why did they do this? They did this because they had a relationship with Harper. They were trying to help Harper,

> *but when the presence of Harper leaves and he's in jail for six months, you can see the pressure is off and they can come into court and testify truthfully as to what happened at that time and day.*
>
> * * *
>
> * * * [A.H.] established a false alibi with [J.K.] and another woman so that she could protect her father. *Once her father is away from her, once that she has the chance to get adjusted and live a somewhat normal life, she came into court and testified very strikingly, very courageous, and as the truth * * *.*
>
> * * *
>
> * * * Again how should we judge that testimony? What reason would these girls have to possibly lie? They have feelings for their father, *but those feelings are not again shrouded by the evil presence of the Defendant and they are able to testify truthfully in this court.*
>
> * * *
>
> * * * Now we've told you time and time again that these people have gotten together. They established an alibi. *Then when they did not have the pressure of the Defendant bearing upon their back, then they told you the truth.*

(Emphasis added.)

■ While counsel are afforded great latitude in the argument of cases, statements calculated only to inflame, prejudice or mislead are not permitted. *James,* 888 P.2d at 207; *Taul,* 862 P.2d at 659. With respect to remarks similar to those complained of in this case, we previously have said:

> In *Tennant v. State,* 786 P.2d 339 (Wyo. 1990), we considered a prosecutor's reference to a defendant as a leech, bloodsucker and predator on society and the prosecutor's suggestion that perhaps next time the defendant could choose crippled children as his victims. We concluded that, while the prosecutor's remarks were unprofessional, they did not fit within those kinds of statements this court has deemed prosecu-

torial misconduct under a plain error analysis.

*James,* 888 P.2d at 207.

In a vein similar to *James,* 888 P.2d 200 and *Tennant v. State,* 786 P.2d 339 (Wyo. 1990), we hold that the prosecutor's comments that Harper has an "evil presence," while unprofessional, did not rise to the level of plain error. We cannot fail to note that the record demonstrates: (1) Harper took the money provided for his youngest daughter's home schooling and used it to buy cocaine; (2) Harper smoked cocaine routinely with his daughter's seventeen year-old friend; (3) Harper used his children to help him dispose of his bloody shoes after the murder; and (4) Harper shot the victim in cold blood in the back of the head. Perhaps the argument of the prosecutor about an evil presence was not far from the mark.

 Harper contends that the doctrine of cumulative error should serve to justify reversal of his conviction. As we have held previously, there was no error committed in this case. When no claim of prejudicial error has been supported, the claim of cumulative error cannot be recognized. *Vargas–Rocha v. State,* 891 P.2d 763, 771 (Wyo. 1995); *Springfield v. State,* 860 P.2d 435, 453 (Wyo.1993). We simply note in conclusion that Harper's unconventional method of dissolving his partnership with the victim was considered by the jury and found to be a violation of the homicide statutes of the State of Wyoming. We can only conclude that Harper deserved the verdict found by the jury.

The Order Upon Jury Verdict, that imposed a life sentence in the Wyoming State Penitentiary upon Harper, is affirmed.